IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BRIAN L. BUSWELL and DEBRA K. BUSWELL,

                      Plaintiffs,

v.

THE UNITED STATES OF AMERICA,

                      Defendant.

OPINION and ORDER

22-cv-395-wmc

---

    Plaintiffs Brian and Debra Buswell maintain that run-off from road salt stored on the adjacent property of the Tomah Veterans Administration Medical Center damaged their arborvitae trees. As a result, plaintiffs filed this lawsuit against the United States, claiming that the damage to its trees: (1) constitutes a taking of their land without compensation in violation of the Fifth Amendment to the United States Constitution; and (2) creates a private nuisance in violation of the Federal Tort Claims Act and Wisconsin law.

    The United States has moved for summary judgment on all of plaintiffs' claims (dkt. #19), and has relatedly moved to exclude the report of plaintiffs' expert arborist, Briana Frank (dkt. #17.) Because the motion to exclude the expert report will be granted in part and denied in part for reasons discussed below, and plaintiffs have failed to offer other, sufficient evidence from which a reasonable jury could find that the VA Center's salt storage caused the damage to their trees, they cannot succeed on their takings or private nuisance claims. Accordingly, the court will grant summary judgment to the United States.

UNDISPUTED FACTS[1]

The Buswells live next to the VA Medical Center in Tomah, Wisconsin. More than 10 years ago, the Buswells planted several northern white cedar trees, also known as arborvitae, in a row between their property and the VA property. In approximately 2010, several of the arborvitae showed signs of stress, and started to die. Because Brian Buswell suspected that road salt stored in the VA Medical Center's material yard was responsible, he contacted the chief of facilities services for the VA Medical Center to share his concern that salt water was flowing toward his property and damaging trees along their shared property line.

At that time, Brian and the chief of facilities both observed that a concrete structure in which salt and sand was stored was failing to contain the materials.[2] With the VA's approval, the Buswells had a culvert and other land grading completed on the VA property. Following these events, the VA removed the salt from its location near the eastern boundary with the Buswell property, and the Buswells replaced the damaged trees.

Sometime in 2020, the Buswells observed damage to some of the replaced arborvitae trees, which they thought looked similar to the damage that had occurred 10 years earlier. This time, the Buswells hired Briana Frank, an arborist from Tree Health Management, to investigate the problem and treat the trees. Frank visited the Buswell's property in June 2020,

---

[1] Except where noted, the following facts are undisputed as drawn from the parties' proposed findings of fact and responses when viewed in the light most favorable to the plaintiffs as the nonmoving parties.

[2] For purposes of summary judgment only, the United States does not dispute that salt was stored outside the VA Medical Center in approximately 2010. However, in its responses to plaintiffs' interrogatories, the United States avers that only sand was stored outside; in contrast, road salt was stored separately, inside a building and was not taken out of storage until actual deicing needed to be done. (Dft.'s PFOF (dkt. #21) ¶ 35.)

and observed that some of the arborvitae on the property line with the VA Medical Center had burned tips, wilting and dieback in the crown of the trees. According to Frank, these symptoms were consistent with salt damage, drought or root rot, and she did not observe drought conditions on the property. A few weeks later, Tree Health Management employees treated 14 trees with a growth regulator chemical and air spaded the soil to incorporate biochar and compost.

The Buswells contacted the VA about the new damage to their trees. Along with VA employees, Brian Buswell investigated the VA property and saw what he thought was "salt residue" immediately east of the Buswell property. The Buswells filed this lawsuit in July 2022, claiming that the VA's storage of poorly contained road salt on its property damaged their replacement arborvitae trees, resulting in a takings in violation of the Fifth Amendment to the United States Constitution and a private nuisance under Wisconsin law and the Federal Tort Claims Act. The Buswells seek $156,240.23 in damages for treating and replacing the trees that suffered damage in 2020. In turn, the government has moved for summary judgment, contending that plaintiffs have failed to offer sufficient proof for a factfinder to find salt from the VA property killed or damaged plaintiffs' trees.

OPINION

To prevail on a takings claim under the Fifth Amendment, plaintiffs must prove that their private property was "taken for public use without just compensation." U.S. Const. amend. V. A clear taking occurs when the government completely deprives private owners of all economically beneficial use of their property, such as a permanent physical occupation of property. *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 332 (2002). However, the Fifth Amendment also prohibits some temporary invasions or

injuries that diminish property values caused by a government action or regulation. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005); *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1070–71, 1074–75 (7th Cir. 2013). Regardless, to succeed on their takings claim, plaintiffs must prove that government action *caused* their property damage.

As an initial matter, the court is skeptical that the alleged saltwater runoff from the defendant's property to plaintiffs' property, even if a cause of damage to plaintiffs' trees, is an actionable "taking" of plaintiffs' property under the Fifth Amendment. "[N]ot every destruction or injury to property by governmental action is a 'taking' in the constitutional sense." *Armstrong v. United States*, 364 U.S. 40, 48 (1960). In particular, damage resulting from government action does not constitute a taking if it is "only incidental" to the government's action. *See Yawn v. Dorchester Cnty.*, 1 F.4th 191, 195 (4th Cir. 2021) (citing *Chicago, B. & Q. Ry. Co. v. Illinois*, 200 U.S. 561, 593–94 (1906) ("If the injury complained of is only incidental to the legitimate exercise of governmental powers for the public good, then there is no taking of property for the public use, and a right to compensation, on account of such injury, does not attach under the Constitution.")). Here, the alleged damage to plaintiffs' trees appears to have been accidental and unintended, and more appropriately treated as a tort, not a takings claim. *See Matter of Chicago, Milwaukee, St. Paul & Pac. R. Co.*, 799 F.2d 317, 326 (7th Cir. 1986) ("Accidental, unintended injuries inflicted by governmental actors are treated as torts, not takings.").

The court need not resolve this question, however, because plaintiffs' takings and tort claims fail for another reason: plaintiffs' private nuisance claims also require proof of causation. *Menick v. City of Menasha*, 200 Wis. 2d 737, 747 (Ct. App. 1996); *see also Wis. Power & Light Co. v. Columbia Cty.*, 3 Wis. 2d 1, 11, 87 N.W.2d 279 (1958) ("A plaintiff claiming private

nuisance must demonstrate that the actor's conduct is a legal cause of the invasion.") (citation omitted). This requires a showing that the alleged invasion was (1) intentional and unreasonable, or (2) unintentional and otherwise actionable under the rules governing liability for negligent, reckless, or ultra-hazardous conduct. *Bostco LLC v. Milwaukee Metro. Sewerage Dist.*, 2013 WI 78, ¶ 30, 350 Wis. 2d 554, 835 N.W.2d 160.

Defendant contends that plaintiffs have insufficient evidence to prove that its actions damaged their trees, as opposed to some other cause. To defeat defendant's motion for summary judgment, therefore, plaintiffs must submit sufficient evidence to show that there is a genuine dispute of material fact regarding whether defendant's storing of road salt on its adjacent property caused the damage to plaintiffs' arborvitae trees.

A threshold issue under dispute is whether expert opinion is necessary to prove that the VA's road salt caused damage to plaintiffs' trees. Plaintiffs argue that requiring expert testimony to prove causation in this case would be an "extraordinary measure," because a factfinder may rely on "common knowledge" that "trees are detrimentally affected by road salt." (Plts.' Br. (dkt. #30) 3–4.) To support this assertion, plaintiffs cite an article from the Smithsonian magazine and an environmental law journal. *See* Joseph Stromberg, *"What Happens to all the Salt We Dump on the Roads?"*, The Smithsonian, Smithsonianmag.com, https://www.smithsonianmag.com/science-nature/what-happens-to-all-the-salt-we-dump-on-the-roads-180948079/?no-ist, Jan. 6, 2014 (last visited Dec. 20, 2023) ("[H]ighly concentrated road salt can dehydrate and kill trees and plants growing next to roadways, creating desert conditions because the plants have so much more difficulty absorbing water."); Sara Labashosky, *The Salty Truth: Revealing the Need for Stricter Road Salt Application and Storage Regulations in the United States*, 26 Vill. Envt'l L.J. 103, 111 (2015).

5

Even assuming that a lay person might reasonably find that excess levels of salt in the soil in some amount would harm plants, however, the court agrees with the government that this general understanding does not answer the "causation" question posed in this case. In particular, whether the type and amount of damage to plaintiffs' arborvitae could have been caused by road salt stored on a neighboring property appears to fall well "outside the realm of ordinary experience and lay comprehension." *See Pinter v. Vill. of Stetsonville*, 2019 WI 74, ¶¶ 60-63, 387 Wis. 2d 475, 929 N.W.2d 547 (expert testimony may be required to prove causation if the subject is "outside the realm of ordinary experience and comprehension.") To answer that question would require the factfinder to determine whether salt stored on the adjacent property was more likely than not to have flowed toward the arborvitae trees in sufficient amounts to cause discernable damage to plaintiffs' trees, as opposed to some other cause. Without expert guidance, the court agrees that a lay person could not determine: whether chlorides or some other cause explains the damage to plaintiffs' trees; *and* even if the cause of the damage, whether those chlorides were caused by road salt or fertilizer. Because these matters are beyond ordinary experience and lay comprehension, expert testimony on tree pathology is required.

The next question then, is whether the testimony of plaintiffs' expert arborist, Briana Frank, is sufficient to raise a genuine factual dispute about the cause of the tree damage.[3] In her first report, which was drafted after her single site visit in June 2020, Frank opined that: (1) the dieback on 14–15 trees on plaintiffs' property in June 2020 was "consistent with salt

---

[3] Plaintiffs also submitted an expert report from Robert Nauta, a hydrogeologist, but they do not rely on his report in opposition to defendant's motion for summary judgment, and agree that he offers no opinion whether salt damaged the trees. (Plts.' Br. (dkt. #30) 5.)

damage to the root system"; and (2) salt damage was the most likely reason for the damage to the trees. (Dkt. #14-1.) In a second report, drafted after a second site visit in July 2023, Frank again opined that, "[g]iven the localized damage (symptomatic of salt damage) to this specific area and the recovery of most of the trees, . . . salt damage remains the most likely and prominent cause of the dieback observed in 2020 on the group of Northern White Cedar." (Dkt. #14-5.)

The government challenges Frank's expert opinions as unreliable and has moved to exclude them under Federal Rule of Evidence 702 for failing to rely on a proper scientific methodology or sufficient data. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993). The court will grant in part and deny in part the government's motion. Some of Frank's opinions are admissible based on her specialized knowledge and experience as an arborist. Specifically, Frank's opinion that the damage to plaintiffs' trees appeared consistent with salt damage -- as modified by her clarifications at her deposition that although other pathologies could cause similar damage, such as drought, root rot, a soil shelf or excess fertilizer -- and that she saw no obvious signs of drought in the area. (Frank Dep. (dkt. #16) 16–17.) The government has identified no valid reason for excluding those opinions, all of which a reasonable factfinder could find were based solely on Frank's initial, firsthand observations and knowledge as an arborist.

However, Frank's opinion that "salt damage was the most likely reason for the damage to the trees" is problematic. Indeed, having agreed that other conditions could cause similar damage, concluding that salt was the "most likely" cause requires both observation and a reliable form of testing, analysis or means of ruling out other potential causes. In her reports, Frank cites the following as the bases for this conclusion: (1) her observations of the damage;

7

(2) the localized nature of the damage; (3) the recovery of most of the trees after treatment; (4) the high pH of the soil around the trees; and (5) soil test kit results showing elevated chlorides. (Dkt. ##14-1; 14-5.) As Frank herself concedes, however, her fourth and fifth observations (the high pH of the soil and the test kit showing elevated chlorides) are unreliable methods of determining whether it was road salt that damaged the trees. This is because the high pH is consistent with many Wisconsin soils (Frank Rep. (dkt. #14-1) 3), and Frank admitted at her deposition that "nothing in [the pH] test would tell you whether this is naturally occurring in the soil or whether it's the result of chlorides." (Frank Dep. (dkt. #16) 29.) The pH test is particularly unhelpful here because neither Frank nor anyone else compared the pH levels of the soil around the damaged trees to the pH levels of the soil around the healthy trees on plaintiffs' property, nor other property further removed from the claimed source of chloride on the VA property. As for the other soil test kit showing elevated chlorides, the LaMotte test, Frank testified that the test is "not official," "not intended to be used for forensic purposes as it can be inaccurate due to user error or test kit quality," "not scientifically valid," "not accept[ed] in a scientific community" and "simply an FYI for [her] team." (*Id.* at 24–28.) Given all of these caveats and disclaimers, neither the LaMotte test nor a general pH test can provide evidentiary support for Frank's opinions.

This leaves plaintiffs with the following evidence of causation: (1) Frank's admissible opinions that the appearance and localized nature of the tree damage in 2020, as well as the trees' subsequent recovery, were consistent with salt damage; (2) plaintiffs' observations that 10 years ago the VA stored uncontained salt next to their property, after which some of their trees were damaged or died; (3) Brian Buswell's observation of "salt residue" on the VA property in 2020; and (4) the lack of evidence that drought or some other cause, such as root

8

rot, a soil shelf or excess fertilizer, could have caused the damage. Plaintiffs contend a factfinder could infer from this evidence alone that the cause of their damaged arborvitae was salt stored negligently on the VA's property.

The court agrees with the government that this evidence is insufficient to establish causation. Plaintiffs' causation theory suffers from four primary evidentiary gaps. First, plaintiffs cite *no* scientific authority suggesting that an arborist can determine tree pathology under similar circumstances, using only personal observation of the foliage of damaged trees.

Second, plaintiffs have submitted *no* evidence that the soil around the damaged trees actually contained elevated levels of sodium chloride, the ingredient in road salt that could have harmed the trees. Plaintiffs' own expert conceded that she performed no scientifically valid testing of the soil at all, because she had not been hired as expert witness when she observed the trees in the summer of 2020 and had no reason to conduct a forensic analysis. (Frank Dep. (dkt. #16) 23, 16, 44.)

Third, plaintiffs have submitted no evidence comparing the damaged trees and their soil to other trees on plaintiffs' property. This matters because both Frank and plaintiffs rely heavily on the "localized" nature of the tree damage as evidence that salt caused the damage. However, Frank admitted at her deposition that she "focused on this particular grouping of trees that was dying back," and "didn't make an acute observation for the whole -- the whole area." (*Id.* at 14.) Nor did she compare any soil around the damaged trees to soil in other areas on plaintiffs' property, although she admitted that it would be important for a forensic analysis to know: whether the damaged trees had been replaced recently; whether they were the same genus and species as surrounding trees; and whether the pattern of dieback on the 2020 trees was similar to other dieback that had occurred in the area. (*Id.* at 16.) Again, Frank

9

testified that she did not seek that information because she had not been hired as an expert witness initially, but rather to treat the currently damaged trees. (*Id.*)

Fourth, plaintiffs have *no* evidence to rule out other potential causes of tree damage, aside from Frank's observation that she saw no signs of drought in the area. Frank admitted that similar damage could also be caused by root rot, excess fertilizers or a soil shelf, but nowhere in her report does she describe any basis for ruling out these other potential causes. Plaintiffs argue that Frank saw no evidence of root rot or a soil shelf when her team excavated the soil for treatment, but Frank conceded at her deposition that she was not present for the excavation, nor had any first-hand knowledge of how the soil was excavated. (*Id*. at 43.) More importantly, Frank acknowledged that the soil excavation was for treatment purposes and to make room for soil amendments, *not* for forensic purposes to rule in or out causes of the tree damage. (*Id.* at 43–44.) In other words, there is no evidence that Frank or her team ever looked for evidence of root rot or a soil shelf, let alone evidence of excess fertilizer use.

Absent evidence to fill these evidentiary gaps, plaintiffs have failed to raise a genuine issue of material fact as to whether infiltration of salt water from the VA's property damaged their arborvitae trees in 2020. "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Merco Distrib. Corp. v. Commercial Police Alarm Co.*, 84 Wis. 2d 455, 460, 267 N.W.2d 652, 655 (1978) (quoted source omitted). Accordingly, defendant is entitled to summary judgment.

ORDER

IT IS ORDERED that:

1) Defendant United States' motion for summary judgment (dkt. #19) is GRANTED.

2) Defendant's motion to exclude expert testimony (dkt. #17) is GRANTED IN PART and DENIED IN PART, as set forth above.

3) The clerk of court is further directed to enter final judgment accordingly.

Entered December 29, 2023.

                                        BY THE COURT:

                                        /s/
                                        _____
                                        WILLIAM M. CONLEY
                                        District Judge